UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **LESLIE VENEGAS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| **v.** | § | |
| | § | **EP-24-CV-00005-ATB** |
| **MARTIN O'MALLEY,** *Commissioner of* | § | |
| *Social Security Administration*, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This is a civil action seeking judicial review of an administrative decision by the Social

Security Administration (SSA).  Pursuant to 42 U.S.C. § 405(g), Plaintiff Leslie Venegas, the

claimant at the administrative level, appeals from the final decision of Defendant Martin

O'Malley, the SSA's Commissioner, denying her claims for disability insurance benefits (DIB)

and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42

U.S.C. § 401, *et seq.*, and § 1382, *et seq.*  The parties consented to have a magistrate judge

conduct all proceedings, including the entry of final judgment.  For the reasons that follow, the

Court finds that the Commissioner's decision should be AFFIRMED.

## I.    BACKGROUND

On August 8, 2019, Venegas, then 29 years old, applied for DIB and SSI, claiming

disability beginning on October 26, 2018.[1]  When she was in middle school, Venegas was

---

[1] Tr. of Admin. R. at 34 [hereinafter "Tr."].  Previously, in 2017, Venegas also applied for DIB and SSI, claiming disability beginning on January 1, 2016.  *Id.* at 144.  On October 25, 2018, an Administrative Law Judge (ALJ), Robert McPhail, denied those claims, *id.* at 155, and on July 19, 2019, the Social Security Appeals Council denied her request for review of ALJ McPhail's decision, *id.* at 160.

diagnosed with myasthenia gravis,[2] and recently, she was diagnosed with asthma.[3]  For her

myasthenia gravis, she receives intravenous immunoglobulin (IVIG) infusions, most recently,

once in every three weeks.[4]  Venegas alleged disability based on myasthenia gravis, asthma,

breathing problems, and muscle weakness.[5]  She has a high school education, attended two years

of college, and in 2012, obtained a degree as a medical assistant.[6]  In the past, she worked as an

office administrative clerk and as a home healthcare provider.[7]

Venegas's claims were denied initially on December 5, 2019, and on reconsideration on

March 24, 2020.  Thereafter, in April 2020, Venegas requested a hearing before an ALJ.  After

multiple postponements and rescheduling due in part to COVID,[8] an in-person hearing was held

before ALJ Gordan Momcilovic on April 18, 2023; at the hearing, Venegas, who was

represented by her attorney, testified, and so did a vocational expert.  On May 24, 2023, the ALJ

issued a written decision denying Venegas's claims for disability benefits.  Venegas then

administratively appealed the decision, but on September 25, 2023, the Appeals Council denied

---

[2] *Id*. at 661; *see also id.* at 417, 642, 687. "Myasthenia gravis is an immunological disorder of neuromuscular transmission, marked by fluctuating weakness, especially of the eye, face, and limb trunk muscles, that characteristically increases with activity." *Henderson* ex rel. *N.T. v. Astrue*, 401 F. App'x 449, 450 n.1 (11th Cir. 2010).

[3] Tr. at 706, 711.

[4] *Id.* at 61.

[5] *Id*. at 388, 417.

[6] *Id.* at 57, 389.

[7] *Id.* at 379, 405, 455.

[8] *E.g.*, *id.* at 183, 198–99, 224, 230, 246, 282, 302, 308.

her request for review; as a result, the ALJ's decision became the final decision of the Commissioner.[9]

On January 4, 2024, Venegas, proceeding *in forma pauperis*, brought this action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  On July 12, 2024, Venegas filed her opening brief, requesting that the Court reverse the Commissioner's decision and remand her claims for further administrative proceedings.  Pl.'s Br. at 2, 13, 18, ECF No. 9.  On August 12, 2024, the Commissioner filed a response to Venegas's brief, requesting that the Court affirm the Commissioner's decision.  Br. in Supp. of Comm'r's Decision at 10 [hereinafter "Def.'s Resp."], ECF No. 11.  Venegas did not file a reply.

## II.   THE SEQUENTIAL EVALUATION PROCESS AND THE ALJ'S FINDINGS AND CONCLUSIONS

Eligibility for DIB or for SSI on the basis of disability requires that the claimant be "disabled" within the meaning of the Social Security Act.  42 U.S.C. §§ 423(a)(1)(E), 1382(a).[10] The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* §§ 423(d)(1)(A), 1382c(a)(3)(A).  "A claimant has the burden of proving [she] suffers from a disability."  *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

To determine disability, the Commissioner uses a sequential, five-step approach, which considers:

---

[9] *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002) ("The ALJ's decision thus became the Commissioner's final and official decision when the Appeals Council denied [the claimant's] request for review on the merits.").

[10] *See also Lyon v. Bowen*, 802 F.2d 794, 796 (5th Cir. 1986) ("To be eligible for SSI an individual must be aged, blind, *or* disabled as defined in 42 U.S.C. § 1382c and have income and resources below the levels specified in 42 U.S.C. § 1382a." (emphasis added)).

(1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity.

*Kneeland v. Berryhill*, 850 F.3d 749, 753 (5th Cir. 2017) (cleaned up); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[11]  "The burden of proof is on the claimant at the first four steps," *Kneeland*, 850 F.3d at 753, and if she gets past these steps, "the burden shifts to the Commissioner on the fifth step to prove the claimant's employability," *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021).  A determination at any step that the claimant is disabled or is not disabled "ends the inquiry." *Id.*

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity (RFC).  *Kneeland*, 850 F.3d at 754.  "The claimant's RFC assessment is a determination of the most the claimant can still do despite his or her physical and mental limitations and is based on all relevant evidence in the claimant's record." *Id.* (brackets omitted); *see also* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  "The RFC is used in both step four and step five to determine whether the claimant is able to do her past work or other available work."  *Kneeland*, 850 F.3d at 754.

Here, ALJ Momcilovic evaluated Venegas's claims pursuant to the above-mentioned five-step sequential evaluation process.  At step one, the ALJ found that Venegas had not engaged in substantial gainful activity since October 26, 2018, her alleged disability onset date.

---

[11] "'The relevant law and regulations governing the determination of disability under a claim for [DIB] are identical to those governing the determination under a claim for [SSI].'"  *Undheim v. Barnhart*, 214 F. App'x 448, 449 n.1 (5th Cir. 2007) (quoting *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985)).  Part 404 of 20 C.F.R. relates to DIB, *see* 20 C.F.R. § 404.1, whereas Part 416 relates to SSI, *see* 20 C.F.R. § 416.101.  As relevant here, the regulations are not materially different; so, hereinafter, the Court may cite to Parts 404 and 416 interchangeably.  *See Sun v. Colvin*, 793 F.3d 502, 506 n.1 (5th Cir. 2015).

Tr. at 36.  At step two, the ALJ determined that Venegas had the following severe impairments: myasthenia gravis and major depressive disorder with anxious distress.  *Id.*  The ALJ also noted that Venegas's asthma, intramural uterine fibroid status-post open myomectomy, menorrhagia or dysmenorrhea with sequela of iron deficiency anemia, hair loss, axillary hidradenitis suppurativa, and hyperglycemia were non-severe impairments.  *Id.* at 37.  At step three, the ALJ found that Venegas's impairments, alone or in combination, did not meet or equal the severity of any impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (the Listing of Impairments) that lead to automatic findings of disability.  *Id.*

Next, before going to step four, the ALJ determined that Venegas retained the RFC to perform "light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with some additional restrictions: she could not climb ladders, ropes, and scaffolds though she could engage in all other postural activities occasionally, and she could understand, remember, and carry out simple job instructions and work-related tasks.  Tr. at 38.

At step four, the ALJ found, based upon the vocational expert's testimony, that Venegas could not perform her past relevant work, i.e., administrative clerk and companion, because the demands of her past work exceeded her RFC.  Tr. at 42–43.  At step five, the ALJ found, again based upon the vocational expert's testimony, that given Venegas's age, education, work experience, and RFC, she could work as an office helper, counter clerk, and routing clerk, and that these jobs existed in significant numbers in the national economy.  *Id.* at 43–44.  The ALJ concluded that Venegas was not disabled under the Act and therefore, was not entitled to disability benefits.  *Id.* at 31, 44.

### III.   STANDARDS FOR JUDICIAL REVIEW

Judicial review, under 42 U.S.C. § 405(g), of the Commissioner's decision denying social security benefits is "highly deferential." *Garcia*, 880 F.3d at 704.  Courts review the Commissioner's decision "only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021) (quotation marks and citation omitted).

Substantial evidence is "more than a mere scintilla," *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019), but "less than a preponderance of the evidence," *Schofield v. Saul*, 950 F.3d 315, 320 (5th Cir. 2020).  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek*, 587 U.S. at 103 (internal quotes omitted).  "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  *Id*.  "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision."  *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016).

In reviewing the Commissioner's decision, "the court scrutinizes the record to determine whether [substantial] evidence is present."  *Sun*, 793 F.3d at 508.  It however may not "try the issues *de novo*" or "reweigh the evidence."  *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018).  "[N]or, in the event of evidentiary conflict or uncertainty," may the court substitute its judgment for the Commissioner's, "even if [it] believe[s] the evidence weighs against the Commissioner's decision."  *Garcia*, 880 F.3d at 704.  "Conflicts of evidence are for the Commissioner, not the courts, to resolve."  *Sun*, 793 F.3d at 508.

## IV.   DISCUSSION

As mentioned above, the Court's review of the Commissioner's decision denying benefits is limited to two inquiries: whether the decision is supported by substantial evidence and whether the Commissioner used the proper legal standards.  *Garcia*, 880 F.3d at 704, *supra*.  Venegas assigns two errors to ALJ Momcilovic's decision.  First, she argues that the ALJ erred in failing to consider and evaluate her hearing testimony.  Pl.'s Br. at 7, 9–13.  Second, she argues that the ALJ's persuasiveness evaluation of the medical opinion of Dr. Darine Kassar, Venegas's treating neurologist, is not supported by substantial evidence.  *Id*. at 7, 13–18.  Below, the Court addresses each in turn.

### A.   Consideration and Evaluation of Hearing Testimony

In determining a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence" including the claimant's own "descriptions and observations of [her] limitations from [her] impairment(s), including limitations that result from [her] symptoms, such as pain." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  The ALJ is required to "evaluate the intensity and persistence of [her] symptoms," considering "all of the available evidence, including [her] medical history, the medical signs and laboratory findings, and statements about how [her] symptoms affect her."  *Id.* §§ 404.1529(c), 416.945(c).  Social Security Ruling (SSR) 16-3p, a sub-regulatory policy, explains that ALJs will assess whether the "individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record."  SSR 16-3p, 2016 WL 1119029, *7 (SSA Mar. 16, 2016) (superseding SSR 96-7p, 1996 WL 374186 (July 2, 1996), which governed evaluation of symptoms and assessment of "credibility" of an individual's statements)).[12]

---

[12] Effective March 28, 2016, the SSA eliminated the use of the term "credibility" in the sub-regulatory policy and stressed that when evaluating a claimant's symptoms, the agency adjudicators will

Here, the ALJ found that although Venegas's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. at 39. After discussing Venegas's allegations from two Function Reports (Exhibits B4E and B8E) that she submitted at the initial and reconsideration stages of the administrative review process and the treatment notes from no fewer than eleven neurology, primary-care, and emergency-room visits between August 2018 and February 2023—the ALJ summarized his assessment of Venegas's descriptions and observations about her symptoms and limitations as follows:

> Considering the foregoing, the claimant's allegations have some support in the record, though not to the extent alleged. The records do document reports of weakness and fatigue partially substantiated by some abnormal exam findings. However, the records also show good management of her myasthenia gravis with treatment. Additionally, physical exams in the record show largely normal findings, including no acute distress, normal speech, no aphasia, intact cognition, normal rapid alternating movements, no weakness or ataxia, grossly intact cranial nerves, no respiratory distress, normal gait and posture, normal motor strength and sensation, no focal neurological deficits, normal reflexes, and ability to rise from chair without hands (B2F/16-19; B4F/2-6; B5F/15-19; B7F/86).

*Id.* at 41.

Venegas argues that the ALJ erred because he failed to consider or evaluate[13] her testimony at the hearing. Pl.'s Br. at 11, 18. She points out that at the hearing, she described various symptoms of her myasthenia gravis; her weakness that makes it difficult for her to walk and tend to her personal needs at times; her abilities to stand, walk, and lift objects; her daily

---

"not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p, 2016 WL 1119029, *1, 10.

[13] In the parlance used by the SSA, "evaluate" implies "a need to provide written analysis," whereas "consider" does not. Revisions to Rules Regarding Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5855–56, 2017 WL 168819 (SSA Jan. 18, 2017).

activities; and the side effects of her medication and treatments. *Id.* at 10–11 (citing Tr. at 60–69). She points out that in his decision, the ALJ expressly considered her "written statements" in the Function Reports mentioned above but faults the ALJ for providing no "assessment or consideration" of her hearing testimony. *Id.* at 11. She contends that remand is required so that her testimony may be considered in the adjudication of her claims. *Id.*

The Commissioner concedes that the ALJ did not discuss Venegas's testimony in his decision but points out that her hearing statements are similar to her statements in the Function Reports and her reports in numerous medical records. Def.'s Resp. at 5. Because the ALJ expressly considered these statements and reports, the Commissioner argues, the ALJ properly considered Venegas's symptoms notwithstanding the omission of a specific discussion of her testimony. *Id.* at 5–6.

The Court cannot agree with Venegas that the ALJ failed to consider her hearing statements. At the conclusion of the hearing, the ALJ acknowledged Venegas's testimony, Tr. at 76, and in his decision, he noted that Venegas testified at the hearing, *id.* at 34. Elsewhere in the decision, the ALJ stated that he considered "all the evidence" in the record, *id.* at 35, and in particular, in assessing Venegas's RFC, he stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 [C.F.R. §§] 404.1529 and 416.929 and SSR 16-3p," *id.* at 38. Simply because the ALJ did not discuss Venegas's hearing statements does not mean that the ALJ did not consider them. *See Castillo v. Barnhart*, 151 F. App'x 334, 335 (5th Cir. 2005) ("That the ALJ did not specifically cite each and every piece of medical evidence considered does not establish an actual failure to consider the evidence."); *Wall*

*v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (Where "the ALJ indicates he has considered all the evidence[,] our practice is to take the ALJ at his word." (cleaned up)).[14]

The vast majority of Venegas's hearing statements are cumulative of her written statements in the Function Reports as well as her subjective reports in the medical records—that the ALJ expressly considered.  For example, she testified that when her myasthenia gravis exacerbates, she experiences double vision, trouble talking, trouble eating, and trouble swallowing, Tr. at 60, and the ALJ, citing to Venegas's Function Reports, recounted her written allegations that "her impairments . . . cause her to experience weakness, blurred vision, slurred speech, difficulty breathing, fatigue, and difficulty chewing and swallowing," *id*. at 39.  She testified that because of her myasthenia gravis, she experiences weakness on the right side of her body, Tr. at 60–61, and the ALJ recounted from treatment notes, *inter alia*, from a May 2020 appointment that she "reported experiencing increased weakness," *id.* at 40 (citing Tr. at 687), and from an April 2022 appointment that "she reported some recurrent weakness," *id.* at 41 (citing Tr. at 1212).  Whereas she testified that she could sit for no more than an hour, stand for only 10-15 minutes, and walk for 10-15 minutes before needing to stop and rest, *id.* at 67–68, she stated in her Function Reports that her conditions affected her abilities to sit, stand, and walk, and that she could walk one block before needing to stop and rest, *id.* at 401, 428.  The ALJ, citing the Reports, noted that Venegas reported being unable to walk long distances or sit and stand for extended periods.  *Id.* at 39.

As for the remaining hearing statements to which Venegas directs the Court's attention, the ALJ's discussion of the medical records suggests that he considered them but found them to

---

[14] *See also Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005) (Although the ALJ must build "a logical bridge" from the evidence to his conclusion, he "need not . . . provide a complete written evaluation of every piece of testimony and evidence." (internal quotes and citations omitted)).

be exaggerated.  For example, Venegas testified that she could lift at most 5 pounds, Tr. at 67, and in her Function Reports, she stated that her conditions affected her ability to lift, *id.* at 428, and even alleged that she could not do any lifting, *id.* at 401 ("Because of illness and condition[,] I am unable to perform any of the items above.").  Although the ALJ did not discuss these statements, he recounted relevant objective medical evidence that weighs in favor of a finding of exaggeration.  *Compare, e.g.*, *id.* at 40 (recounting that exams in March 2019 showed "no weakness or ataxia, and normal strength and tone in all extremities" (citing Tr. at 605–06)), *id.* (recounting that exams in July 2021 showed "normal reflexes, coordination, gait, muscle strength, and tone" and "normal extremity strength" (citing Tr. at 865)), *and id.* at 41 (recounting that exams in February 2023 showed "normal range of motion and strength" (citing Tr. at 1263), *with id.* at 40 (recounting that exams during a neurology follow-up visit in May 2020 showed "significant proximal weakness" but also nothing that her IVIG infusion was discontinued two months prior (citing Tr. at 685, 687, 691)).  Ultimately, the ALJ concluded that Venegas's "reports of weakness and fatigue [are] partially substantiated by some abnormal exam findings" and that her "allegations have some support in the record, though not to the extent alleged."  *Id*. at 41; *see also Clary v. Barnhart*, 214 F. App'x 479, 482 (5th Cir. 2007) ("Obviously, the evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ." (internal quotes omitted)); *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988) (The ALJ is not required to "give subjective evidence precedence over medical evidence.").

Similarly, regarding side effects of her medications and treatments, and her daily activities, Venegas testified: her medications cause nausea, diarrhea, and sleepiness; during the day, she takes two to three breaks; and during those breaks, she sleeps or just lays down in bed, though she mostly sleeps because the pills make her sleepy.  Tr. at 63–64.  In her Function

Reports, she stated that she experiences nausea and drowsiness from her pills, and headaches and nose bleedings from IVIG infusions, *id.* at 403, and she also stated that after waking up in the morning, she takes her medications, eats, and then lays down to rest, *id.* at 424.  In his decision, the ALJ recounted from treatment notes from a neurology follow-up visit in January 2021 that she reported medication compliance "without any major side effects."  *Id.* at 40 (citing Tr. at 912 ("She is compliant with her medications for MG [i.e., myasthenia gravis].  Without any major side effects." (treatment notes))).  The same treatment notes indicate that her IVIG infusion caused no major side effects.  *Id.* at 912.  According to treatment notes from another appointment, "[w]ith IVIG, at times she has headache, but it is tolerable."  *Id.* at 862.  Further, the ALJ recounted from treatment notes from an appointment in August 2018 that she "reported being able to independently perform activities of daily living."  *Id.* at 39 (citing Tr. at 608 (treatment notes)).  From these, the ALJ could reasonably conclude, as he did, that Venegas's "allegations have some support in the record, though not to the extent alleged."  *Id.* at 41.

In sum, although an explicit mention of some of Venegas's testimony about her impairments, symptoms, limitations, and daily activities would have been helpful, the ALJ's omission of her testimony in his decision does not require remand because Venegas's statements at the hearing are largely cumulative of her allegations and subjective reports in the Function Reports and in the medical records that the ALJ expressly considered, and further because the ALJ's discussion of the medical evidence indicates that he considered her hearing statements but found them to be exaggerated.  *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) (rejecting argument that the ALJ's decision did not adequately evaluate and discuss certain evidence and stating, "[w]here . . . we can follow the adjudicator's reasoning . . . , merely technical omissions . . . do not dictate reversal"); *Bennett v. Berryhill*, No. CV 17-2671-KHV,

2018 WL 6267767, at *10 (D. Kan. Nov. 30, 2018) ("An ALJ's failure to discuss evidence that is largely cumulative of other evidence is not grounds for remand." (citing *Davis v. Astrue*, 237 F. App'x 339, 342 (10th Cir. 2007)); *Lord v. Apfel*, 114 F. Supp. 2d 3, 13 (D.N.H. 2000) ("Courts have held that an ALJ's failure to address a specific piece or pieces of evidence did not undermine the validity of her conclusion, . . . when that conclusion was supported by citations to substantial medical evidence in the record and the unaddressed evidence was . . . cumulative of the evidence discussed by the ALJ." (collecting cases)).

## B.  Persuasiveness Evaluation of Dr. Kassar's Opinions

For benefits claims filed on or after March 27, 2017, such as Venegas's claims here, the SSA enacted substantial revisions to the regulations governing the evaluation of medical opinion evidence.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, *supra*.  Under the new regulations, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . from [a claimant's] medical sources," including the opinion of the claimant's treating physician.  20 C.F.R. §§ 404.1520c(a), 416.920c; *see also Webster*, 19 F.4th at 718–19 (stating that "ALJs are no longer required to give controlling weight to a treating physician's opinion, as was mandated by federal regulations and our caselaw in the past"); *compare Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995) (explaining that under the so-called "treating-physician rule," the opinions of a claimant's treating physicians are entitled to "great weight"), *with Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 897 (11th Cir. 2022) ("In 2017, the Commissioner eliminated the treating-physician rule.").

Instead, for claims filed after March 27, 2017, an ALJ must, considering several specified factors, "articulate in [his] . . . decision how persuasive [he] find[s] all of the medical opinions

and all of the prior administrative medical findings" in the record.  20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see also id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5) (listing factors).  "[T]he most important factors" are "supportability" and "consistency," and the ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings."  *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  The ALJ however need not explain how he considered the remaining factors, such as the medical source's "specialization," "relationship to the claimant," and "understanding of [the SSA's] disability program's policies and evidentiary requirements"—unless "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported and consistent with the record," *id.* §§ 404.1520c(b)–(c), 416.920c(b)–(c), a condition that is not present here.

Dr. Kassar rendered her opinion on a check-box and fill-in-the-blank form, entitled Medical Release/Physician Statement (MRPS); she completed the MRPS in April 2022 for purposes of Venegas's application for food stamps before the Texas Health and Human Services Commission.  Tr. at 42, 1218.  Specifically, for standing, Dr. Kassar checked the box indicating that Venegas could perform the activity for a maximum of two hours per workday; for walking, she did the same; for sitting, she checked the box for "other"; and for lifting, she wrote "none," without checking any box.[15]  *Id.* at 1218.  Following the check-box section of the MRPS, Dr. Kassar stated that Venegas may not lift or carry objects more than 10 pounds for more than 1 hour per day.  *Id.* at 1219.  She also wrote "myasthenia gravis" in a box labeled "primary disabling diagnosis," and in response to the question, "any other remarks, recommendations or

---

[15] To indicate the maximum hours per workday that an applicant can perform the listed activities, the MRPS form instructs its respondent to select one of the five boxes for each listed activity, respectively, representing 2 hours, 4 hours, 6 hours, 8 hours, and "other."  Tr. at 1218.

restrictions?" she wrote that Venegas "has an auto-immune disorder that could be doing well for a while[,] then exacerbates." *Id*.

In evaluating the MRPS, the ALJ stated that Dr. Kassar assessed that Venegas is unable to sustain even "sedentary work"[16] and determined that this assessment was not persuasive. Tr. at 42. The ALJ explained that Dr. Kassar's assessment was conclusory and her own treatment records did not support her assessment. *Id*. Further, the ALJ found, Dr. Kassar's assessment was not consistent with prior assessments of the state agency physicians, Dennis Pacl, M.D. and Randal Reid, M.D., or with Venegas's own reports of her ability to perform activities of daily living. *Id*. Dr. Pacl and Dr. Reid had reviewed the record evidence and provided their assessments, respectively, at the initial and reconsideration stages of the administrative review process.

## 1. *Supportability*

"Supportability" is the degree to which a provider supports her medical opinion by relevant objective medical evidence and explanations. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Venegas argues that the ALJ's supportability-factor analysis is not supported by substantial evidence. Pl.'s Br. at 18. The Court disagrees.

First, the ALJ found that Dr. Kassar's assessment was "conclusory." Tr. at 42. Dr. Kassar stated that her myasthenia gravis could be doing well for a while, then exacerbates, but that statement does not explain, why, for example, she assessed that Venegas could not lift or carry more than 10 pounds for more than 1 hour per day or that she could walk a maximum of

---

[16] *See* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

two hours per workday.  Dr. Kassar provided no further statements, nor did she mention any supporting objective tests and examinations.  So, the ALJ's characterization of Dr. Kassar's opinion as "conclusory" was reasonable.[17]

Second, the ALJ explained that Dr. Kassar's own treatment records do not support her assessment of Venegas's abilities because the records show good management of her myasthenia gravis with treatment.  Tr. at 41–42; *see also Adams v. Soc. Sec. Admin., Comm'r*, No. 23-11233, 2024 WL 2846726, at *3 (11th Cir. June 5, 2024) (unpublished) ("'[C]heck box' opinions cannot be dismissed as conclusory on that basis alone and should be read in light of the provider's treatment notes." (citing *Schink v. Comm'r of Soc. Sec*., 935 F.3d 1245, 1262 (11th Cir. 2019))).  To illustrate, the ALJ pointed out that the records from Venegas's appointment with Dr. Kassar in March 2019 describe Venegas as doing well, and exams at this appointment showed no weakness or ataxia, intact cognition, normal posture, and normal strength in all extremities.  Tr. at 42 (citing Tr. at 603–06).

Moreover, throughout his written decision, the ALJ discussed Dr. Kassar's other treatment notes that further support a finding of good management of Venegas's myasthenia gravis with treatment.  For example, the ALJ noted that after her IVIG infusion was discontinued in March 2020,[18] she reported during a visit in May 2020 that she was experiencing increased

---

[17] *Cf. Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (concluding that ALJ did not err discounting a treating physician's assessments because they "consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses," and "[t]hey cite no medical evidence and provide little to no elaboration" (applying pre-2017 regulations governing medical opinions)); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011) (finding that treating physician's opinion was not entitled to considerable weight because of "its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examinations" (same)).

[18] "Her IVIG infusion was discontinued in March [2020] as plan to wean off IVIG."  Tr. 687 (treatment notes from May 12, 2020 follow-up visit).

- 16 -

weakness, difficulty swallowing, and shortness of breath, and that the treatment notes from that visit showed a plan to restart her IVIG incursion.  Tr. at 40 (citing Tr. at 687–91).  The ALJ also recounted from treatment notes of Venegas's next follow-up visit in July 2020 that after her infusion was restarted, her symptoms improved, she returned to baseline, and she reported being content with her improvement.  *Id.* (citing Tr. at 682).[19]  As another example, the ALJ noted that at Venegas's follow-up visit with Dr. Kassar in April 2022, Venegas continued to report feeling good on her medication regimen.  *Id.* at 41 (citing Tr. at 1212).[20]  At the conclusion of the ALJ's discussion of Dr. Kassar's treatment notes from Venegas's visits between August 2018 and February 2023—the ALJ deduced that physical exams in the record show largely normal findings, including no weakness or ataxia, normal gait and posture, normal motor strength, normal reflexes, and ability to rise from chair without hands.  *Id.* at 41 (citing Dr. Kassar's treatment notes).

The Court therefore finds that the ALJ's supportability analysis and finding are supported by substantial evidence.  *See Kraus v. Saul*, 988 F.3d 1019, 1025 (8th Cir. 2021) (concluding that ALJ properly discredited treating physician's conclusory opinion on check-box form because the physician provided no explanation or evidence in support of his conclusions and the opinion was not consistent with his treatment notes); *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988) ("If an impairment reasonably can be remedied or controlled by medication or therapy, it cannot

---

[19] *See also* Tr. at 682 ("Since last visit patient has been rec[ei]ving IVIG q[uaque] 3 weeks . . . . She currently reports all of her presenting symptoms from last visit have improved and she has returned to her baseline.  P[atient] is content with this improvement" (treatment notes from May 12, 2020 follow-up visit)).

[20] *See also* Tr. at 1212 ("She is currently on [M]estinon (pyridostigmine) 60mg q[uaque] 4 hrs, cellcept (mycophenolate) 1500 mg [twice a day], and IVIG every 3 weeks[,] and prednisone 5 mg (5 days before menstruation) before her menstruation.  She continues to feel good with this regimen." (treatment notes from April 22, 2022 follow-up visit)).

serve as a basis for a finding of disability."); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.").

Venegas sees things differently.  Citing to Dr. Kassar's treatment notes, Venegas contends that her myasthenia gravis is "episodic," in that she experiences periods of relative improvement and stability punctuated by episodic exacerbations.  Pl.'s Br. at 14.  That's why, Venegas argues, Dr. Kassar remarked on the MRPS that Venegas's myasthenia gravis could be doing well for a while, then exacerbates, and assessed her abilities to perform exertional activities as "quite limited."  *Id.* at 14–15.  Citing to treatment notes from an emergency room visit in June 2018 and from Venegas's visits with Dr. Kassar in May 2020, July 2020, and April 2022, Venegas claims that the ALJ cherry-picked some examination findings during her periods of stability—to portray Dr. Kassar's assessment as unsupported by the record, but, Venegas continues, the ALJ "disregarded" evidence showing episodic exacerbations of her conditions.  *Id.* at 15 (citing Tr., at 481, 685, 687-91, 1212–15).  Had the ALJ properly taken into consideration the "waxing and waning" nature of her myasthenia gravis symptoms, Venegas speculates, he would have been persuaded by Dr. Kassar's assessment.  *Id.* at 18.

As an initial matter, although Venegas provides pin citations to the pages of the treatment notes, she does not specify what particular statements, observations, or diagnoses in the cited pages she relies on or the ALJ disregarded.  As the Commissioner points out, the ALJ discussed each visit's treatment notes that Venegas cites.  Def.'s Resp. at 7–8.  For example, from the notes from Venegas's emergency room visit on June 12, 2018,[21] which Venegas claims the ALJ disregarded, the ALJ recounted that she reported worsening weakness and fatigue, but that her

---

[21] She had a "[m]ild exacerbation of myasthenia gravis associated with viral respiratory illness." Tr. at 487.

symptoms improved after she was administered a dose of IVIG. Tr. at 39 (citing Tr. at 485). The ALJ also noted that she was discharged on the following day, with instructions to resume her home medications, and exams at discharge showed normal findings. *Id.* (citing Tr. at 481–85); *see also id*. at 485 (instructing Venegas to continue her home medications and monthly IVIG infusion). Likewise, in discussing Dr. Kassar's April 2022 treatment notes, the ALJ recognized that Venegas reported some recurrent weakness, eyelid droopiness, and difficulty swallowing, but also observed that she continued to report feeling good on her medication regimen. *Id*. at 41.

The thrust of Venegas's arguments is that Dr. Kassar's assessment is consistent with her treatment notes. But "the question before [the Court] is limited to whether the ALJ's decision -- not Dr. [Kassar]'s opinion -- is supported by substantial evidence. That Dr. [Kassar]'s opinion might be consistent with some record evidence is not enough to overturn the ALJ's decision." *Cf. Vergara v. Comm'r of Soc. Sec*., No. 22-11671, 2023 WL 5814433, at *3 (11th Cir. Sept. 8, 2023) (unpublished). "Although [Venegas] may disagree with the ALJ's [determination]" that Dr. Kassar's own treatment records do not support her assessment of Venegas's abilities, as mentioned above, "it is supported by substantial evidence." *Cf. Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022) (addressing challenge to ALJ's persuasiveness evaluation of the claimant's treating rheumatologist opinion).

## 2. *Consistency*

"Consistency" is the degree to which a provider's medical opinion is "consistent with the evidence from other medical sources and nonmedical sources'" in the record. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). Venegas argues that the ALJ's consistency-factor analysis is not supported by substantial evidence. Pl.'s Br. at 18. Recall that the ALJ determined that Dr.

Kassar's assessment is not consistent with the assessments of the state agency physicians, Dr. Pacl and Dr. Reid, or with Venegas's own reports of her ability to perform activities of daily living. Tr. at 42. Venegas advances several subsidiary arguments: first attacking the ALJ's reliance on the state agency physicians' assessments and then attacking the ALJ's consideration of her reports of daily activities.

      **(a) ALJ's Reliance on State Agency Consultants' Findings in Consistency Analysis**

Dr. Pacl and Dr. Reid each determined that Venegas had the RFC to perform "light work"[22] with postural limitations and subsidiarily determined that she could sit, stand, and walk, each for a total of 6 hours (with normal breaks) in a workday and could lift or carry 20 pounds occasionally and 10 pounds frequently. Tr. at 97–98, 102, 127–28, 132. But Dr. Kassar assessed that Venegas could stand and walk for a maximum of two hours per workday and could not lift or carry objects more than 10 pounds for more than 1 hour per day. *Id.* at 1218–19. Before evaluating Dr. Kassar's assessment, the ALJ evaluated the persuasiveness of Dr. Pacl's and Dr. Reid's assessments. The ALJ found their assessments persuasive, reasoning in part that the state agency physicians supported their assessments with citations to evidence showing normal strength, no proximal weakness, normal deep tendon reflexes, and intact cranial nerves. *Id.* at 41 (citing Tr. at 129).

Venegas argues that the fact that Dr. Kassar's opinion is not consistent with the opinions of the state agency consultants has no bearing on the consistency of Dr. Kassar's opinion with the other evidence of record. Pl.'s Br. at 15–16. She explains that the opinion of a treating physician would always be inconsistent with the state agency consultants' opinions because if it

---

[22] *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").

were consistent, the claimant's benefits claim would be approved at an earlier level of the administrative review process and therefore, would not be adjudicated by an ALJ. *See id.* at 16. She adds that Dr. Kassar is a specialist in neurology and the state agency consultants are not. *Id.* (citing 20 C.F.R. § 404.1520c(4), which sets forth the specialization factor for persuasiveness analysis).[23] She contends that Dr. Kassar's opinion is not inconsistent with the record and "less persuasive" because it varies from the "less-informed" opinion of the state agency consultants who have no "first-hand knowledge" of Venegas's conditions. *Id.* (citing 20 C.F.R. § 404.1520c(3), which sets forth the "relationship with the claimant" factor, which considers, *inter alia*, the length and extent of the treatment relationship).

For several reasons, the Court is not persuaded by Venegas's arguments. First, the consistency factor requires comparing a physician's opinion under review against evidence from other sources, 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2), but Venegas fails to point to anything in the regulations that say that a state agency consultant's assessment and findings do not qualify as such evidence. Although a state agency consultant's findings "are not in themselves evidence at the level of the administrative review process at which they are made," *id.* § 404.1513a, they become evidence for an ALJ's review process, *id.* § 404.1513a(b) (An ALJ must "consider prior administrative medical findings . . . from our Federal or State agency medical . . . consultants."); *see also id.* § 404.1513(a)(5) (defining "prior administrative medical finding" as one of several categories of evidence).

---

[23] 20 C.F.R. § 404.1520c(4) ("The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." (describing the specialization factor)).

Second, although Venegas emphasizes the specialization factor and the "relationship with the claimant" factor as they relate to Dr. Kassar's specialty in neurology and her treatment relationship with Venegas, the regulations also require an ALJ to consider a medical source's "understanding of [the SSA] disability program's policies." *Id*. § 404.1520c(5). The regulations explain that "[s]tate agency medical . . . consultants are highly qualified and experts in Social Security disability evaluation." *Id.* § 404.1513a(b)(1); *see also* SSR 17-2p, 2017 WL 3928306, at *3 (SSA Mar. 27, 2017) (State agency medical consultants "are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the Act.").

Third, the regulatory history surrounding the promulgation of the new rules governing the evaluation of medical evidence for benefits claims filed on or after March 27, 2017, further undercuts Venegas's arguments. In promulgating 20 C.F.R. § 404.1520c, the SSA explained that the new regulation eliminates confusion about the "hierarchy" of medical sources—i.e., according the most weight to treating sources, less weight to examining sources, and the least weight to non-examining or reviewing sources such as state agency medical consultants—that was inherent in the former regulation, 20 C.F.R. § 404.1527, and its treating-physician rule.[24] Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5853, *supra*. In addition, the SSA rejected a recommendation that the agency adjudicators should never consider evidence from state agency medical consultants to be "more persuasive" than evidence

---

[24] *See, e.g.*, *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." (citing, among others, § 404.1527(c)(2), (d)(3) (cleaned up)), *cited in Kneeland*, 850 F.3d at 760 n.52 (5th Cir. 2017) ("This treating physician regulation currently appears at 20 C.F.R. § 404.1527(c)(2).").

from a claimant's own medical source because the consultants are "unqualified." *Id*. at 5856. In so rejecting, the agency explained that it maintains "strict requirements" for who may serve as a "qualified" state agency medical consultant. *Id.* These consultants, the agency added, "have valuable experience in [the] adjudicative processes, and their review of all of the evidence [in the record] provides them with a comprehensive perspective that other medical sources, including an individual's own medical sources, may not have." *Id.*

Finally, courts have affirmed an ALJ's adverse persuasiveness determination of a treating physician's opinion where the opinion was not consistent with the opinion of a state agency medical consultant. *See, e.g.*, *Bowers*, 40 F.4th at 875–76 (concluding that ALJ properly rejected claimant's rheumatologist's opinion that the claimant's conditions require extensive exertional limitations, where state agency physicians reported that he could perform light work and the ALJ found that the state agency physicians' opinions were "more consistent" with the medical records); *id.* at 876 ("Nor was the ALJ's reliance on [the state agency physicians'] opinions an error."); *Vergara*, 2023 WL 5814433, at *2 (concluding that ALJ adequately articulated that treating psychiatrist's opinion was inconsistent with the overall record, where the ALJ found that her opinion was inconsistent with the opinions of two state agency psychological consultants); *see also Thompson v. Soc. Sec. Admin.*, No. 23-30702, 2024 WL 1886757, at *2 (5th Cir. Apr. 30, 2024) (unpublished) (rejecting plaintiff's argument that ALJ erred by accepting a state agency consultant's (Dr. Gruenwald) opinion over an examining consultant's (Dr. Day) opinion because Gruenwald was a "non-examining plastic surgeon" and reasoning that the plaintiff offers no support for her contention that Gruenwald's specialty as a plastic surgeon is disqualifying and adding that "[t]o the contrary, because Gruenwald was a state agency consultant, the SSA

regulations *required* the ALJ to consider Gruenwald's findings" (citing 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1))).

### (b) ALJ's Consideration of Self-Reported Daily Activities in Consistency Analysis

Citing to Venegas's Function Reports, the ALJ determined that Dr. Kassar's assessment is not consistent with Venegas's own report of her ability to perform activities of daily living. Tr. at 42 (citing Tr. at 423–30). Elsewhere in his decision,[25] the ALJ noted that Venegas indicated on the Reports that she could prepare simple meals, perform some light household chores, drive, go out alone, and shop in stores. *Id.* at 37 (same). Further, the ALJ recounted that at a neurology follow-up visit on August 3, 2018 (which was a few days before her alleged disability onset date), Venegas reported being able to independently perform activities of daily living. *Id.* at 39 (citing Tr. at 608). Therefore, the Court is satisfied that substantial evidence exists to support the ALJ's consistency determination based on Venegas's daily activities. *See Riccio v. O'Malley*, No. 23-35265, 2024 WL 3898560, at *1 (9th Cir. Aug. 22, 2024) (unpublished) (concluding that substantial evidence supported ALJ's evaluation of physician's opinion, where the ALJ rejected portions of the opinion because they were inconsistent with the claimant's reported activities, which included, among other things, travel, shopping, raising her grandchildren, and helping others in the community), *aff'g* No. 3:22-CV-5461-DWC, 2023 WL 2300645, at *3 W.D. Wash. Mar. 1, 2023) (recounting that the physician opined that the claimant

---

[25] *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (stating—in the context of reviewing ALJ's analysis of the consistency factor under pre-2017 regulation, 20 C.F.R. § 404.1527(c)—that although "the ALJ did not reproduce the list of [the claimant's] treatment records a second time when she explained why [the claimant's primary-care physician's] opinion was inconsistent with this record[,] . . . it suffices that she listed them elsewhere in her opinion"); *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five, we consider the ALJ's treatment of the record evidence in support of both his conclusions at steps three and five." (internal citation omitted)).

was limited to lifting no more than 20 pounds occasionally and 10 pounds frequently due to the weakness of her hands and left shoulder).[26]

Venegas argues that the ALJ made no reference to Venegas's hearing testimony wherein she described her daily activities, Pl.'s Br. at 16, but as discussed in Part IV.A of this Opinion, though the ALJ did not discuss Venegas's hearing statements in his decision, he considered them but found them to be exaggerated in view of medical and other evidence. *See* Tr. at 41 ("Considering the foregoing, [Venegas's] allegations have some support in the record, though not to the extent alleged." (ALJ's decision)). She also points to treatment notes from her neurology follow-up visit with Dr. Kassar in March 2019, which show that during that visit, Venegas reported that she was able to do activities of daily living, but that she had to rest during the day and take multiple breaks. *Id.* at 603, *cited in* Pl.'s Br. at 16–17. Dr. Pacl and Dr. Reid cited this subjective report in their assessments, *id.* at 99, 129, but nonetheless assessed less restrictive exertional limitations than those assessed by Dr. Kassar, and the ALJ found Dr. Pacl's and Dr. Reid's assessments persuasive.[27]

Venegas's arguments invite the Court to reweigh evidence, which it may not do. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole

---

[26] *See also Esco v. Kijakazi*, No. 2:21-CV-119-CWB, 2023 WL 2721006, at *8 (M.D. Ala. Mar. 30, 2023) (concluding that substantial evidence supported ALJ's determination that consultative examiner's opinion—that the claimant "must rest his neck and lie down every hour for relief of neck pain"—was not consistent with the claimant's own reports of his daily activities including that he "tended to his personal care, prepared meals, performed light chores, . . . shopped, [and] drove"), *aff'd sub nom.* No. 23-11777, 2024 WL 1156572, at *4 (11th Cir. Mar. 18, 2024) (holding that substantial evidence supported the ALJ's persuasiveness analysis of the consultative examiner's opinion).

[27] *Cf. Adams*, 2024 WL 2846726, at *1, *3 (concluding that substantial evidence supported the ALJ decision to afford little weight to treating physician's opinion—that the claimant "would be off task fifty percent of the time and would fail to report to work twenty-five days a month [due to] her medical condition"—because "other medical evidence was . . . consistent with episodic back pain that was responsive to treatment, and her own self-report reflected daily activities exceeding the limitations" the physician assessed).

responsibility for weighing the evidence."); *Miller v. Kijakazi*, No. 22-60541, 2023 WL 234773, at \*4 (5th Cir. Jan. 18, 2023) (unpublished) (stating, in the context of addressing ALJ's persuasiveness analysis of medical opinions, that plaintiff "is essentially asking us to reweigh the evidence . . . which we cannot do"); *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at \*2 (6th Cir. Dec. 1, 2022) (unpublished) (stating that arguments underlying plaintiff's objection—that the ALJ misapplied 20 C.F.R. § 404.1520c in evaluating his treating physician's opinion—are "a veiled attempt to have us reweigh the evidence").

In sum, the Court finds that substantial evidence supports the ALJ's determination that Dr. Kassar's assessment was not persuasive.

## V.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**So ORDERED and SIGNED this  28th  day of January 2025.**

**ANNE T. BERTON**
**UNITED STATES MAGISTRATE JUDGE**